# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOCELYN DEMAIO | : | CIVIL ACTION NO. 3:09CV2133(PCD) |
| *Plaintiff* | : | |
| | : | |
| v. | : | |
| | : | |
| STATE OF CONNECTICUT | : | |
| DEPARTMENT OF CORRECTION | : | |
| *Defendant* | : | JUNE 30, 2011 |

## DEFENDANT'S LOCAL 56(a)1 STATEMENT OF UNDISPUTED FACTS

1.  The plaintiff, Jocelyn DeMaio (hereinafter "DeMaio"), began her employment with the defendant, Department of Correction (hereinafter "DOC"), in 2001 in the position of Correction Officer (hereinafter "CO").  She trained for the first three months in the New Haven County jail, and then was assigned to the Carl Robinson Correctional Institution (hereinafter "CRCI") for seven (7) years.  In November 2008, she was voluntarily transferred to Manson Youth Correctional Institution.  In August 2010, she was assigned to the Hartford Correctional Center as an administrative transfer pending an investigation after which she requested a permanent transfer. (Ex. A, Excerpt of Deposition of Jocelyn DeMaio, dated October 15, 2010, at pp.17-20; hereinafter "DeMaio depo.").

## ALLEGED SEXUAL ASSAULT IN JULY 2003

2.  In July 2003, DeMaio alleges that she suffered a sexual assault on the day shift by Lieutenant Jiminez (hereinafter "Lt. Jiminez") at the CRCI in the office of the Security Risk Group (hereinafter "SRG") office by Lt. Jiminez sticking his tongue down her throat and grabbing her ass.  Given that the windows in the "SRG" office were tinted and they

were by themselves, there were no witnesses to the incident. (Ex. A, DeMaio depo. at pp. 44: 20-25, 45: 1-25).

3.  DeMaio did not file a formal written complaint against Lt. Jiminez because she feared retaliation for reporting a lieutenant. "I didn't want to put it on paper because I didn't want any problems.  I was fairly new to the department.  And I didn't want any problems with lieutenants.  Because you get blackballed very easily in the department."  (Ex. A, DeMaio depo. at pp. 46:3-13, 51:2-22).

4.  Although DeMaio did not file a formal written complaint, she reported the alleged incident to Captain Todd Case (hereinafter "Captain Case") on the third shift later that night.  Captain Case instructed her to speak to Lt. Jiminez about the incident within a two (2) week timeframe.  (Ex. A, DeMaio depo. at pp. 46:1-8, 49:9-19, 50:1-25, 51:1).

5.  DeMaio testified that she followed Captain Case's instructions to speak to Lt. Jiminez within the two week timeframe and let Lt. Jiminez know that what he had done was wrong, not acceptable, and that if it happened again, she would put it on paper. (Ex. A, DeMaio depo. at pp. 46:13-18, 51:13-22).

6.  DeMaio recalls that she spoke to Lt. Jiminez during the second week of the two week timeframe since Lt. Jiminez was on vacation during the first week.  Lt. Jiminez agreed that his behavior was wrong and unacceptable. (Ex. A, DeMaio depo. at pp. 46:13-25).

7.  DeMaio testified that she has suffered no other sexual assaults by Lt. Jiminez or any other DOC lieutenants or employees at any other time. (Ex. A, DeMaio depo. at pp. 46:23-25, 51:23-25, 52:1-8).

8.  Lt. Jiminez was not DeMaio's supervisor at the time of the alleged incident but was simply on overtime on the second shift like DeMaio. (Ex. A, DeMaio depo. at p. 52:9-18).

9.  DeMaio testified that it was Captain Case's job to file a written complaint regarding the Jiminez alleged sexual assault. (Ex. A, DeMaio depo. at p. 51:6-8).

10. Captain Case does not recall Ms. DeMaio reporting to him in July 2003 any incident of sexual assault by Lt. Jiminez that occurred in the SRG office. (Ex. C, Case Aff. at ¶5).

11. Documentation from the personnel file of Captain Todd Case indicates that he was assigned from Third Shift Commander at Carl Robinson Correctional Institution to Administrative/Intelligence Captain as of June 30, 2003.  The Intelligence Captain position is a first shift position and is located in the SRG office along with the position of another Captain.  (Ex. B, Affidavit of Daniel Callahan, dated June 27, 2011, at ¶33, hereinafter "Callahan Aff.;" Ex. C  attached hereto Affidavit of Todd Case, dated June 28, 2011 at ¶4, hereinafter "Case Aff.").

12. Captain Case recalls that DeMaio reported an alleged sexual assault by Lt. Jiminez  that she alleged occurred in July 2003 to him in October 2003 during an interview of her that he conducted as part of an investigation of undue familiarity with an inmate. (Ex. C, Case Aff. at ¶9; Ex. D, Affidavit of Kimberly Weir, dated June 27, 2011 at ¶53, hereinafter "Weir Aff.;"  Ex. C, Case Aff. at ¶9).

13. Captain Case did not report the sexual assault to affirmative action in October 2003 because he understood from DeMaio that she had filed a formal complaint with the Affirmative Action Unit.  (Ex. C, Case Aff. at ¶10; Ex. D, Weir Aff. at ¶53).

14. DeMaio testified that she filed a police report regarding the alleged sexual assault at the time that she left CRCI in 2008 but was unable to press charges against Lt. Jiminez based on the statute of limitations. (Ex. A, DeMaio depo. at p. 47:1-25, 48:1-3).

15. A copy of the above-described police report was requested by the investigator during the affirmative action investigation in April 2009 of DeMaio's complaint filed with the Commission on Human Rights and Opportunities (hereinafter "CHRO") which DeMaio never produced. (Ex. D, Weir Aff. at ¶53).

**DOC'S SEXUAL HARSSMENT PROCEDURE**

16. The Office of Equal Employment Opportunity has had an affirmative action complaint procedure in place at all relevant times since February 8, 2002, with subsequent revisions effective June 6, 2002, October 15, 2003, February 10, 2004, May 1, 2007, and September 15, 2008.  (Ex. D, Weir Aff. at ¶57).

17. DOC implements the affirmative action procedure through its Director of Equal Employment Opportunity in an endeavor to investigate and promptly remedy problems reported by its employees. (Ex. D, Weir Aff. at ¶58).

**DEMAIO'S TRAININGS ON SEXUAL HARASSMENT**

18. At the time of hire, each employee is given a copy of the Employee Handbook which includes the agency's sexual harassment policy for which they are require to sign to indicate receipt of the same. The policy is also posted at every facility and on the website. (Ex. D, Weir Aff. at ¶59).

19. DeMaio's New Employee Checklist Sign-Off signed on 11-16-01, indicates her receipt of the Employee Handbook at the time of her hire in 2001 and her acknowledgment of her

responsibility to know and understand, among other things, the policies and procedures which govern her conduct relative to her employment. (Ex. D, Weir Aff. at ¶60).

20. In addition to receiving a copy of the Employee Handbook, new employees attend sexual harassment training as part of the Pre-Service Training Orientation.  Employees are also required to attend yearly trainings on sexual harassment as of 2003. (Ex. D, Weir Aff. at ¶61).

21.  The records of the Pre-Service Training Orientation for 2001 indicate that DeMaio attended sexual harassment training on January 4, 2002. (Ex. E, attached hereto, Affidavit of Ted Angelakopoulos, dated June 27, 2011, at ¶7, hereinafter "Angelakopoulos Aff.").

22.  DeMaio's training records indicate that she attended sexual harassment training on March 3, 2004, May 10, 2005, November 8, 2005,  December 22, 2006, and March 26, 2008. (Ex. D, Weir Aff. at ¶60).

23. Given that the DOC training year covers July 1 through June 30, an employee can attend two trainings in one calendar year that pertain to two different training years.   In DeMaio's case, although she attended two trainings on sexual harassment in 2005, the first training on May 10, 2005 related to the 2005 training year and the second training on November 8, 2005, related to the 2006 training year. Likewise, the training on December 22, 2006 related to the 2007 training year.  Accordingly, DeMaio attended yearly sexual harassment training from 2004-2008. (Ex. D, Weir Aff. at ¶63).

**STIPULATED AGREEMENT, DATED APRIL 16, 2003**

24. On  2003, a stipulated agreement was filed which settled the claims for injunctive relief in two lawsuits, <u>Orr et al. v. State of Connecticut, Department of Correction et al</u>., Civil Action No. 3:02CV1368 (AHN/HBF) and <u>Allen, et al. v. Armstrong, et al</u>., Civil Action

5

3:02CV1370 (AHN/HBF) filed by several DOC female employees alleging claims of sexual harassment. The stipulated agreement certified the class of DOC female employees, and, among other provisions, provided for the review of all existing Department policies and procedures relating to sexual harassment, retaliation and related misconduct, the investigation and remediation of such claims, and the training of all supervisory and non-supervisory staff. In addition, the stipulated agreement provided for a "90-day open filing period" for all DOC employees and all members of the class to come forward with claims of sexual harassment, no matter how old the act, omission or incident complained of as well as requests for reinvestigations of prior complaints. (Ex. D, Weir Aff. at ¶¶64, 65).

25. On May 1, 2003, the Commissioner directed the Division Heads to hand-deliver to every DOC female employee a copy of the Notice of Class Certification and Proposed Settlement of Class Action Injunctive Relief Claims regarding the above-described class action lawsuit against DOC. The division heads were also directed to document the process by which each woman received a copy of the Notice. The distribution of said Notice was required to be done by May 7, 2003. (Ex. D, Weir Aff. at ¶66).

26. On May 8, 2003, the Commissioner was informed by the Deputy Commissioner that the Notice of Class Certification and Proposed Settlement of Class Action Injunctive Relief Claims had been hand delivered and/or mailed to each female staff person at the 18 facilities, District Offices, Central Office Operations, CTU and Community Enforcement. In addition, the Commissioner was informed that notice was posted on facility bulletin boards, and staff were made aware that a copy of the entire stipulated agreement was available in the Unit Administrator's Office. (Ex. D, Weir Aff. at ¶67).

27. On June 26, 2003, in accordance with the Stipulated Agreement, the Commissioner issued a memorandum to all DOC employees and employees of the UConn Health Center Correctional Managed Health Care Program notifying them of the court approval of the Stipulated Agreement.  Attached to the memorandum was a copy of the synopsis of the provisions of the Stipulated Agreement, which set forth the "90-day open filing period," and a copy of the proposed revisions to A.D. 2.2.  (Ex. D, Weir Aff. at ¶68).

28. The Commissioner's above-described memorandum together with the synopsis of the Stipulated Agreement and proposed revisions to A.D. 2.2 were issued to all employees by being stapled to the pay stubs of the same as the most effective means of communication. (Ex. D, Weir Aff. at ¶69).

29. Pursuant to the stipulated agreement, solicitation for membership on the Commissioner's Advisory Group on Women's Issues to all female employees was made in the July 6-19, 2003 agency newsletter, entitled "Pride at Work."  (Ex. D, Weir Aff. at ¶70).

30. Captain Case recalls the issue of sexual harassment being an important issue in the spring and summer of 2003 because of notice being issued to all employees of  a stipulated agreement that resolved lawsuits brought by female staff regarding sexual harassment. (Ex. C, Case Aff. at ¶6).

31. Captain Case recalls receiving a copy of the notice of the Stipulated Agreement and its provisions in the spring of 2003 which reinforced his awareness of his supervisory responsibility for reporting sexual harassment.  His awareness was based on his training which caused him to consider his responsibility very seriously.  For that reason, he reported each and every complaint of sexual harassment of which he became aware. (Ex. C, Case Aff. at ¶¶7, 8).

**ADMINISTRATIVE DIRECTIVES**

32. Given that DOC is a quasi military agency, DeMaio, as a DOC employee, is responsible for knowing and following the A.D.s (hereinafter "AD"), Post Orders, and policies and procedures which govern her conduct relative to her employment with the agency. (Ex. B, Callahan Aff. at ¶9).

33. DeMaio signed a New Employee's Checklist Sign-Off acknowledging her responsibility for knowing and following the above-described A.D.s. (Ex. B, Callahan Aff. at ¶10).

**A.D. 2.17 PROHIBITION AGAINST UNDUE FAMILIARITY WITH INMATES**

34. A.D. 2.17 sets forth standards of conduct required of employees as well as conduct strictly prohibited, including conduct related to undue familiarity with inmates. The clear delineation of the prohibition against undue familiarity in Section 5B ¶15 has been in effect since 2000 when A.D. 2.17 was revised to include the prohibition. (Ex. B, Callahan Aff. at ¶11).

35. Revisions of the above-described A.D. 2.17 has been made in several years; including May 10, 2002, January 31, 2009, and April 15, 2010. (Ex. B, Callahan Aff. at ¶11).

36. The DOC has a number of documented incidents which involve undue familiarity between staff and inmates. As in many of these cases, the staff member becomes emotionally manipulated by an inmate who incessantly preys on the individual's human compassion. Eventually, the staff member's professional sensibility is challenged and security is compromised without the true comprehension that any wrongdoing was committed. (Ex. B, Callahan Aff. at ¶12).

37. The issue of undue familiarity is covered by the courses taught in the Pre-Service Training for new employees during their 10 week period of orientation at which time they

are given a workbook of training materials that includes the leading article on undue familiarity, entitled "Downing the Duck." (Ex. E, Angelakopoulos Aff. at ¶¶5, 8, 9-11).

38. DeMaio attended Pre-Service Training at the Maloney Center for Training and Staff Development in 2001which included training on the issue of undue familiarity in the course entitled Behavior Management; specifically in a module entitled "Inmate/Staff Relations."  (Ex. E, Angelakopoulos Aff. at ¶¶6, 8, 9).

39. On February 10, 2004, DeMaio received a written reprimand for poor judgment for engaging in personal interactions with an inmate following a facility investigation for undue familiarity with inmate Diaz conducted in October 2003 by Captain Case. DeMaio's  discipline related to being observed spending an excessive amount of time with a particular inmate, Diaz, and conveying aspects of her personal life during these conversations, including showing the inmate a photograph of her child.  The investigation revealed that by engaging in this type of personal interaction, her professionalism as a Correction Officer was compromised.  (Ex. B, Callahan Aff. at ¶13).

40. The above-described facility investigation regarding inmate Diaz was initiated based on information provided by a confidential informant that DeMaio was conveying illicit narcotics into the facility to Diaz and sending money to Diaz's inmate bank account. (Ex. B, Callahan Aff. at ¶14).

41. The above-described written reprimand issued on February 10, 2004, was removed from DeMaio's personnel file pursuant to Article 13, Section 2 of the NP-4 contract. (Ex. B, Callahan Aff. at ¶¶15, 16).

42. On March 10, 2009, a Security Division investigation of four incidents reports of allegations of undue familiarity of DeMaio with inmate Colon concluded that the

allegations could not be substantiated.  The investigation was initiated on December 3, 2008, based on information gathered from June 2008 through November 2008, including information received from another inmate and receipt of a phone call by DeMaio on her personal cell phone from the mother of another inmate, Perez, allegedly due to the theft of staff phone numbers at CRCI.  In addition, the investigation was initiated based on Colon's correspondence with a female with whom he attempted to make contact through his brother to whom he gave Officer DeMaio's current cell phone number as well as the receipt of a handwritten letter from Colon at her residence. (Ex.B, Callahan Aff. at ¶17).

43. Although the allegations of undue familiarity with Colon were not substantiated, DeMaio received a one (1) day suspension for poor judgment on June 1, 2009 for having personal conversations with staff within hearing distance of inmates which allowed inmates to obtain her personal information in violation of A.D. 2.17, Section 5B 1.  In addition, DeMaio failed to report an incident in a timely manner concerning the possibility of inmates having a CRCI overtime call out list that included staff phone numbers in violation of A.D., Section 5A 1.  Finally, DeMaio failed to cooperate fully and truthfully in refusing to answer relevant questions during her interview, engaged in unprofessional and disruptive behavior on at least two occasions during the interview and interrupted the interview by taking a cell phone call and refusing to comply with the investigator's instructions to shut the phone off.  This behavior was found to be in violation of A.D. 2.17, Section 5A 18.  (Ex. B, Callahan Aff. at ¶18).

44. During the investigation of the above-described incident reports regarding the allegations of undue familiarity with inmate Colon, DeMaio stated that the reason she had been investigated so frequently was due to the jealousy of her co-workers regarding the

amount of money she made from overtime.  She further stated that the reason was her personality, her work ethic, "the way I come across.  I mean I don't know I'm very forward." (Ex. B, Callahan Aff. at ¶19).

## DISCIPLINES OF MALE STAFF FOR UNDUE FAMILIARITY WITH INMATES

45. The following male employees, including Correction Officers, have been disciplined for undue familiarity with inmates in violation of A.D. 2.17 Section 5B ¶15.  (Ex. B, Callahan Aff. at ¶20).

- **Victor Adorno (Male)**
- **Correction Officer**
- **Dismissal**
- **Date of discipline: April 30, 2009**

Officer Adorno conveyed Gameboy cassettes and an interface cable to an inmate.

- **Michael Alleyne (Male)**
- **Correction Officer**
- **5-day suspension in lieu of dismissal via stipulated agreement**
- **Date of discipline: August 13, 2009**

Officer Alleyne spoke to an inmate who repeatedly asked him to bring in a lighter, cigarettes and marijuana.  The inmate showed him photographs of girls and told him to call the girls and the officer told the inmate he liked one of the girls because she had a "big butt."  He did not report the inmate and claimed that he was just "b-sing" with the inmate and had no intention of conveying contraband.

- **Bilal Ansari (Male)**
- **Chaplain**
- **1-day suspension**
- **Date of discipline: July 16, 2008**

Chaplain Ansari brought unauthorized items into the facility (Kuffis) and distributed them to inmates.

- **Bilal Ansari (Male)**
- **Chaplain**
- **5-day suspension**

11

- **Date of discipline: March 31, 2008**

An inmate was found with Chaplain Ansari's business cards and telephone number/address. Another inmate was found with Chaplain Ansari's e-mail address at a professional religious association. Chaplain Ansari admitted to bringing business cards into the facility but said he secured them in the chapel area and they had been stolen. He also admitted to writing his professional e-mail on blackboard during class and said he did so in order to show inmates what a professional e-mail address should look like. Chaplain Ansari's discipline letter notes that his discipline would ordinarily have been higher but mitigating circumstances were taken into account.

- **Jawad Ashraf (Male)**
- **Chaplain**
- **1-day suspension**
- **Date of discipline: January 30, 2006**

Chaplain Ashraf reported to a facility on a date on which he was not authorized to be there. He asked to see an inmate. During the meeting with the inmate, Chaplain Ashraf was observed passing something to the inmate. The objects passed turned out to be magic markers. Chaplain Ashraf did not have permission to give the inmate those items.

- **Jawad Ashraf (Male)**
- **Chaplain**
- **Dismissal**
- **Date of discipline: March 24, 2008**

Chaplain Ashraf was caught attempting to convey contraband into the facility. He was caught with a bag containing sneakers, wrist watches (individually packaged), sweatpants, a letter opener, a bottle of KY jelly, and an electronic device that reveals the presence of cameras.

- **Kevin Blackburn (Male)**
- **Correctional Counselor**
- **30-day suspension in lieu of termination through stipulated agreement**
- **Date of discipline: July 24, 2006**

Counselor Blackburn called the mother of an inmate on his caseload to ask her if she was going out for drinks. He claimed to have known her for 5-6 years prior to the phone call. The inmate's mother asserted that Counselor Blackburn called her and asked her if she wanted to go out to breakfast and discuss some things involving her son.

- **Richard Blanc (Male)**
- **Lieutenant**

- **30-day suspension**
- **Date of discipline: March 17, 2003**

Lieutenant Blanc found out that his nephew had violated parole by failing to report back to his halfway house.  Lieutenant Blanc assembled a remand team, apprehended his nephew and questioned him.  Lieutenant Blanc became irate during the questioning, asked the inmate why he had disappointed the family and slapped him on the head.

- **Richard Blanc (Male)**
- **Lieutenant**
- **Written reprimand**
- **Date of discipline: August 17, 2005**

After his nephew received a disciplinary report, Lieutenant Blanc contacted the facility he was in and spoke to another lieutenant.  That lieutenant claims that Lieutenant Blanc was unprofessional in his tone and manner although the investigation could not substantiate this.  The investigator, however, concluded that Lieutenant Blanc used poor judgment in allowing himself to handle a personal family matter instead of distancing himself from it.

- **Clyde Bobo (Male)**
- **Mail Handler**
- **Dismissal**
- **Date of discipline: May 1, 2009**

Mail Handler Bobo looked at pornographic magazines with an inmate and another officer and gave the inmate pornographic magazines.  He was also untruthful about this during an investigation.

- **Allen Dow (Male)**
- **State School Teacher**
- **25-day suspension (discipline combined with discipline for inappropriate e-mail to supervisor) (mitigation of a long career with an unblemished record noted)**
- **Date of discipline: February 3, 2009**

State School Teacher Dow made several copies of a "postage free" envelope for an inmate.  The inmate then made other copies and distributed them throughout the facility and many inmates attempted to use the copies to obtain free postage.

- **Richard Garner (Male)**
- **Correctional Maintenance Supervisor**
- **5-day suspension & demotion**
- **Date of discipline: March 27, 2009**

CMS Garner purchased a birthday cake and shared it with an inmate whose birthday it was that day.

- **Garland May (Male)**
- **Correction Officer**
- **Dismissal (later reduced to a 30-day suspension)**
- **Date of discipline: February 18, 2004**

Officer May made romantic advances towards an inmate's spouse. He spoke to the woman, wrote her a letter and asked her out on a date.

- **Michael Mitsou (Male)**
- **Correctional Food Services Supervisor II**
- **Written reprimand**
- **Date of discipline: September 24, 2004**

CFSS II Mitsou allowed a chaplain to convey food (meat and poultry) into the facility without permission and provide it to an inmate. CFSS II Mitsou had knowledge of the chaplain's actions and permitted them to occur.

- **David Pessoni (Male)**
- **Correction Officer**
- **5-day suspension**
- **Date of discipline: July 17, 2003**

A staff member allowed an inmate to braid her hair. Officer Pessoni observed this and knew this was a violation of DOC rules but did not intervene or report the inappropriate conduct.

- **Jared Rodriguez (Male)**
- **Correction Officer**
- **10-day suspension**
- **Date of discipline: June 11, 2007**

Officer Rodriguez greeted two inmates returning from visits by grasping their hands and giving them a pat on the back. He was less than truthful about the incident when interviewed about it.

### AD 2.17 PROHIBITION AGAINST UNPROFESSIONAL CONDUCT

46. As an agency with a quasi-military structure, DOC has ranks of supervisors who are responsible for leading staff in the care of a dangerous inmate population which vastly

outnumbers the staff on duty at any given time.  Given the inherent hazards in this organization, it is of paramount importance to follow the many rules and post orders. Section 5B ¶11 of AD 2.17 prohibits unprofessional behavior. The Department has a number of documented incidents which involve unprofessional behavior on the part of correction officers toward their supervisors for which discipline has been imposed.  (Ex. B, Callahan Aff. at ¶21).

47. On March 16, 2005, DeMaio received a written reprimand for unprofessional behavior in violation of A.D. 2.17, Employee Conduct, and failure to follow procedures in violation of Post Order 2.8,  following  a facility/administrative investigation of Incident Report #0849-04 filed by Lt. Reaves.  The investigation substantiated DeMaio's failure to respond on December 22, 2004, to Lt. Reaves's request for entry to the officer's duty station by opening the door when she was able to do so and her unprofessional responses to Lt. Reaves in being questioned as to why she did not open the door, "because I don't have to."  The investigation also substantiated her subsequent unprofessional response to Lt. Reaves's question as  to why the entry doors to the A-side of the unit were locked; she replied "I can and will" lock the doors.  Finally, the investigation substantiated her failure to follow procedures related to Post Order 2.8 requiring dead bolts to remain open unless instructed otherwise by a supervisor.  (Ex. B, Callahan Aff. at ¶22).

48. On February 17, 2005, the Loudermill hearing was held regarding the above-described Facility Investigation #CR-04A1-009. (Ex. B, Callahan Aff. at ¶23).

49. The above-described written reprimand issued on March 16, 2005, was removed from DeMaio's personnel file pursuant to Article 13, Section 2 of the NP-4 contract. (Ex. B, Callahan Aff. at ¶¶15, 24).

## DISCIPLINES OF MALE STAFF FOR INSUBORDINATION/INAPPROPRIATE CONDUCT TOWARD THEIR SUPERVISOR

50. The following male employees, including Correction Officers, have been disciplined for

insubordination/inappropriate behavior in violation of A.D. 2.17, Section 5B ¶11.  (Ex. B,

Callahan Aff. at ¶25).

- **Angel Vega (Male)**
- **Correction Officer**
- **Written Reprimand**
- **Date of discipline: October 18, 2010**

Officer Vega was directed by a Lieutenant to complete door check sheets before the end of his shift.  He refused and became argumentative, said he would complete the paperwork later, and exited the lieutenant's office without completing the sheets.

- **Patrick Baker (Male)**
- **Correction Officer**
- **Two-day suspension**
- **Date of discipline: March 31, 2009**

Officer Baker called a Lieutenant and asked for a weapon so Officer Baker could perform perimeter patrol.  He did not identify himself but demanded the lieutenant "come out and do the weapon."  Officer Baker refused to identify himself and became loud and hostile.  Later, Officer Baker told the Lieutenant that asking an officer to identify himself was "bullshit."  Officer Baker was reassigned from his perimeter patrol post and refused the Lieutenant's order to take a different post until persuaded to do so by a Captain.  The next day, Officer Baker was hostile when informed his post was being reassigned to a post without weapons contact and said "this is bullshit" and demanded his union representative.  The Captain ordered Officer Baker several times not to enter the roll call room but Officer Baker did so anyway, slamming the door in the Captain's face.  Officer Baker also refused an order to leave the roll call room.

The discipline letter notes that ordinarily discipline would have been more severe but mitigating circumstances were taken into account.

- **Maurice Butler (Male)**
- **Captain**
- **5-day suspension**
- **Date of discipline: January 29, 2007**

Captain Butler's supervisor called him and paged him.  He did not respond to either the message left or the page and denied receiving them (although phone records suggested otherwise).  He had a two verbal altercations with his supervisor (according to his supervisor, Captain Butler told him many things including that the supervisor was old and should retire, and according to both Captain Butler and his supervisor, he told his supervisor that he was going to call the police).  After he was relieved from duty, Captain Butler came back to work, logged into his computer and printed out documents.

Discipline was later reduced through stipulated agreement to a written reprimand.

- **Anthony Chukwurah (Male)**
- **Correction Officer**
- **1-day suspension**
- **Date of discipline: June 17, 2008**

Officer Chukwurah confronted a Lieutenant about his post being changed.  The Lieutenant had to give Officer Chukwurah several orders to take his post before he did so.  Officer Chukwurah also refused to submit an incident report about the incident.  The following day, he was found off his post eating his lunch.

- **James Cook (Male)**
- **Correction Officer**
- **Written reprimand**
- **Date of discipline: October 31, 2005**

A Lieutenant noticed that no evening meal had been provided to the inmates on the unit who had been attending visits during meal time.  She asked Officer Cook to provide them meals should they request them.  When she returned several hours later, the inmates told her they had not eaten.  She acquired bag meals and ordered Officer Cook to deliver them.  He said no, that he had just finished his tour and would not walk again until his next tour.  The Lieutenant gave him an order to deliver the meals, fill out an incident report and left the unit.  It appears that Officer Cook waited 10 – 20 minutes before delivering the meals after the order.

- **Joseph Delconte (Male)**
- **Correction Officer**
- **5-day suspension**
- **Date of discipline: February 9, 2009**

Certain doors in the facility would not open.  Officer Delconte was directed by a Counselor Supervisor to get emergency keys to open the doors.  The Counselor Supervisor conducted a tour and noticed Officer Delconte still sitting at the officer's station.  He asked Officer Delconte whether he had drawn the emergency keys and Officer Delconte said "no, you don't need them."  The Counselor

Supervisor again directed Officer Delconte to draw the keys and Officer Delconte said "no."   Officer Delconte refused to draw the keys until a particular lieutenant or the shift supervisor directed him to do so.  The Counselor Supervisor gave Officer Delconte a direct order to draw the keys and was later advised that Officer Delconte did not draw the keys.

- **Allen Dow (Male)**
- **State School Teacher**
- **25-day suspension (discipline combined with discipline for photocopying envelope for inmate) (mitigation of a long career with an unblemished record noted as mitigation)**
- **Date of discipline: February 3, 2009**

State School Teacher Dow was half an hour late and was told by his Principal that he needs to report to a supervisor if he's going to be late.  He became irate and told her there were issues going on at home.  A few days later he again yelled at the Principal and asked her how much more difficult she was going to make his job after she reminded him that inmates should not be standing behind his desk or retrieving paper from the printer.  Several days later he sent a letter to the Principal describing his resentment towards her, the deterioration of their working relationship, her leadership style, her relationship with other teachers, and his discontent for her disruption to his classroom.  He also claimed the Principal made lewd innuendos in his presence but declined to file an AA complaint (although the incident was forwarded to AA for review anyway).  The investigator concluded that the letter was disrespectful, inappropriate, insubordinate, hostile and threatening.

- **Scott Fieldhouse (Male)**
- **Correction Officer**
- **Written Reprimand**
- **Date of discipline: February 8, 2010**

An inmate had been in a fight.  A lieutenant told Officer Fieldhouse not to clean him up until photographs were taken.  Officer Fieldhouse asked "where do you want to put him all bloody."  The lieutenant asked if there was an issue.  Officer Fieldhouse said "what, you gonna act tough now?" and told the lieutenant that he was not going to do shit.  The lieutenant told Officer Fieldhouse to write an incident report and Officer Fieldhouse said "I ain't giving you shit."

- **George Fogarty (Male)**
- **Correction Officer**
- **Written Reprimand**
- **Date of discipline: December 1, 2005**

Officer Fogarty was apparently upset about being removed from his post. He went to the lieutenants' office and began yelling and questioning why his post was moved. He made statements that Lieutenant Torres was a racist.

- **Tommy Fountain (Male)**
- **Correction Officer**
- **5-day suspension**
- **Date of discipline: December 30, 2008**

Officer Fountain, who was assigned to CTU (inmate transportation) refused a direct order to begin his route for the day. He said, in an insubordinate and combative manner, that he would start his route when he was ready.

- **Eugene Hollingworth (Male)**
- **Correction Officer**
- **Written Reprimand**
- **Date of discipline: April 27, 2009**

Officer Hollingworth approached a lieutenant after roll call and asked why his post had been changed. The lieutenant told Officer Hollingworth that he was assigned to 3 East and if he did not take his post, he could decline his overtime and go home. Officer Hollingworth said "fuck you" and pointed his index finger at the lieutenant several times. A short time later, Officer Hollingworth went to the lieutenants' office and stated he was going home. As the lieutenant was on the phone (calling another officer to come in to cover the post), Officer Hollingworth said "what's wrong? You can't look at me? You're a coward." Officer Hollingworth was ordered to submit an incident report and he again said "fuck you."

- **Shawn Irwin (Male)**
- **Correctional Treatment Officer**
- **Written Reprimand**
- **Date of discipline: April 7, 2009**

CTO Irwin was given the responsibility of checking off which inmates had arrived at the classroom building for college classes. He was instructed that, if an inmate was not in attendance, he was to identify the reason. CTO Irwin appeared to question those instructions. Later that evening, CTO Irwin reported to the lieutenants' office that his task was completed but one inmate was not checked off as being present. A lieutenant ended up trying to locate the inmate. CTO Irwin sarcastically said "well, I guess we have an escape if we can't find him."

- **Mikhael McArthur (Male)**
- **Correction Officer**
- **10-day suspension**

- **Date of discipline: May 13, 2004**

A lieutenant noticed Officer McArthur wearing an unauthorized hat.  He reminded Officer McArthur that he could not wear a hat not issued by DOC. Officer McArthur said he was not going to take off his "fucking hat."  Later that shift, another lieutenant (who knew about the hat situation) saw Officer McArthur with the same unauthorized hat.  He asked Officer McArthur what was the issue with him taking off the hat.  Officer McArthur said it was "bullshit" and he was being singled out.  During his Loudermill, Officer McArthur said that if one of his tardies was dropped, he would drop his AA complaint about the hat.  The investigation also found Officer McArthur to be less than truthful.

- **Michael Musco (Male)**
- **Correction Officer**
- **1-day suspension**
- **Date of discipline: December 30, 2009**

Several inmates told a captain touring Officer Musco's unit that they were not getting showers.  The captain told Officer Musco that the inmates had not received showers in four days so they were to get showers.  Officer Musco told the captain inmates were not getting showers because they were taking too long and he was not going to pop one door.  The captain told Officer Musco that not giving inmates a shower was not an option and directed him to give them showers.  Officer Musco told the captain that she was undermining his authority and she should just have him relieved.

- **Gonzalo Ortiz (Male)**
- **Correction Officer**
- **30-day suspension**
- **Date of discipline: April 26, 2005**

Officer Ortiz left the facility for 30 minutes without notifying anybody.  When he reported back to the facility, a lieutenant instructed him to notify him prior to leaving the facility.  Officer Ortiz said "who said I need to notify you" and also said "I don't need to notify you.  I report to the warden" in a disrespectful tone.  A captain reiterated the instruction and Officer Ortiz said "I don't need to give you shit."  When asked to leave the office until he calmed down, Officer Ortiz said "who is going to make me leave the office?" and "you don't intimidate me."  The captain told Officer Ortiz that he was out of line and Officer Ortiz responded with "fuck you mother fucker, kiss my ass."  The captain had to escort Officer Ortiz out of the office.  When the lieutenant ordered Officer Ortiz to write an incident report, Officer Ortiz refused.  When the captain ordered Officer Ortiz  to write an incident report, he said "I'll write the report if it fucking turns you on."

- **Gonzalo Ortiz (Male)**
- **Correction Officer**

20

- **5-day suspension stipped to 2-day suspension**
- **Date of stipulated agreement: April 12, 2009**

A lieutenant observed inmates in Officer Ortiz's unit gambling.  He instructed Officer Ortiz to break up the groups into no more than 4 inmates per table and to not permit them to gamble.  Officer Ortiz responded by announcing over the PA system that the lieutenant does not want any gambling tonight and  no more than 4 to a table.  After the lieutenant left the unit, Officer Ortiz continued to allow the inmates to gamble.  He also only did 5 tours out of the 9 required tours.  Officer Ortiz was also observed reading a newspaper while on duty.

- **Gonzalo Ortiz (Male)**
- **Correction Officer**
- **Written Reprimand**
- **Date of discipline: December 4, 2002**

Officer Ortiz asked a question of a lieutenant at roll call.  She answered it.  He asked the same question again.  She told him to see her after roll call.  Officer Ortiz said "I ain't gonna see YOU.  I'm going to the major."  The lieutenant asked for an incident report and Officer Ortiz said "I don't have to write anything for YOU."

- **Ronald Roberts (Male)**
- **Correction Officer**
- **Written Reprimand**
- **Date of discipline: February 8, 2008**

Officer Roberts refused to conduct a scheduled "kickout," saying that the unit was clean and the inmates, therefore, did not have to leave.  He questioned the purpose of the kickout, who generates the kickout schedule and why the kickout was called by the recreation officer.

- **Mark Sizer (Male)**
- **Correction Officer**
- **Written Reprimand**
- **Date of discipline: February 8, 2006**

A lieutenant requested that all second housing unit officers report to the chow hall.  Officer Sizer and another officer responded as requested but soon left the chow hall.  The lieutenant issued two more orders for all second housing unit officers to report to the chow hall but Officer Sizer and the other officer did not respond.  The lieutenant had to go outside and get Officer Sizer.  The other officer refused to come inside and used profanity.  During the subsequent investigation, Officer Sizer lied and said that the other officer was compliant with the order to return to the chow hall and that he did not hear any profanity.

- **Joseph Stacy (Male)**
- **Correction Officer**
- **Written Reprimand**
- **Date of discipline: January 27, 2004**

Officer Smith approached the control window to retrieve required equipment.  A captain requested chits from him but Officer Smith did not have any chits.  When asked where they were, Officer Smith said "somewhere in there."  When the captain tried to explain the importance of not leaving the facility without collecting chits, Officer Smith waived his hand at the captain and said "yeah, yeah, put it on my resume."

- **Cyril Sullivan (Male)**
- **Correction Officer**
- **1-day suspension**
- **Date of discipline: February 18, 2006**

(Same incident as the one in which Officer Sizer was involved above).  Officer Sullivan was called to the chow hall. He arrived at the chow hall and immediately left and went outside.  When a lieutenant ordered him to come back, he used obscene and offensive language (saying the lieutenant did not have to treat him "like a fucking child," "lieutenants do not report to the chow hall" and that he was "sick of this fucking bullshit.")

- **Bruce Towbridge (Male)**
- **Correction Officer**
- **Written Reprimand**
- **Date of discipline: December 23, 2003**

Officer Towbridge completed an incident report and a use of force report but they were vague.  Officer Towbridge was ordered to re-write the reports and he became argumentative, saying "I have seventeen years on the job.  I don't do paperwork."  He became loud with the lieutenant, flailed his arms, and slapped his hand into his other hand in an excited manner.

- **Larry Vaughn (Male)**
- **Correction Officer**
- **Written Reprimand**
- **Date of discipline: December 21, 2010**

Officer Vaughn left his post without proper relief to serve as a union representative for another officer.  He attempted to answer questions posed to the

other officer instead of allowing the officer to answer for himself.  Therefore, he used his position as a union steward to influence and/or direct an officer not to cooperate with a superior officer.

- **Angel Vega (Male)**
- **Correction Officer**
- **Written Reprimand**
- **Date of discipline: October 18, 2010**

A lieutenant asked Officer Vega whether he had completed his door check sheet. Officer Vega said that he would complete the sheet at the end of his shift.  The lieutenant explained to Officer Vega the importance of completing the sheets in a timely manner.  Officer Vega became argumentative and said he would do the paperwork later.  The lieutenant had coached Officer Vega about the same issue the two previous nights.

- **Arthur Whitehead (Male)**
- **Correction Officer**
- **5-day suspension**
- **Date of discipline: October 7, 2004**

Officer Whitehead made a remark to a fellow staff member about his supervisor. He said "that man better be careful because he does not know how nasty I can be."  This was overheard by a lieutenant.  Officer Whitehead was less than truthful during the subsequent investigation into the incident.

## AD 2.17 PROHIBITION AGAINST ABUSIVE LANGUAGE TOWARD INMATES

51. Among the conduct prohibited by A.D. 2.17 is conduct involving abusive language toward inmates by staff which is considered conduct that jeopardizes the safety and security of the facility, staff and inmates. (A.D. 2.17 Section 5B 1).  Such conduct also violates the employee's responsibility to act in a professional, ethical and responsible manner. (A.D. 2.17 Section 4) as well as the standard of conduct requiring employees to maintain an appropriate demeanor at all times. (A.D. 2.17 Section 5A 15).  (Ex. B, Callahan Aff. at ¶26).

52. DOC has a number of documented incidents which involve abusive language by staff toward inmates which are taken very seriously because of staff responsibility for caring

for a dangerous inmate population which vastly outnumbers the staff on duty at any given time.  Given the inherent hazards in this environment, staff is expected to maintain professionalism at all times in order to assure the safety and security of the facility. (Ex. B, Callahan Aff. at ¶27).

53. On December 2, 2008, DeMaio received a one (1) day suspension for unprofessional and inappropriate conduct in calling an inmate a derogatory name; namely a "snitch," following an administrative investigation conducted Captain Gemini Murray.  DeMaio admitted to calling the inmate a "snitch" in the presence of other officers but staff corroborated that she had made previous statements loud enough so that other inmates could hear.  The conduct was found to be in violation of A.D. 2.17, including jeopardizing the safety and security of the facility, staff and inmates. Section 4 employee responsibility "each employee of the department shall act in a professional, ethical manner."  The conduct was also found to be in violation of Section 5A 3, "ensure a safe secure environment" and Section 5A 15, "maintain appropriate demeanor at all times." Witness testimony of two correctional officers corroborated the incident.  The one (1) day suspension was reduced to a written reprimand pursuant to a stipulated agreement. (Ex. B, Callahan Aff. at ¶28).

54. DeMaio claims that another male Correction Officer May, was accused of a similar incident of calling an inmate a "snitch," but an incident report was never written nor did an investigation occur despite the inmate reporting the incident to a lieutenant, and the lieutenant reporting the incident up the chain of command to the Captain, Deputy Warden and Warden.  (Ex. A, DeMaio depo. at pp. 54:12-25, 55:1-25, 56:1-2, 25; 57:1-25).

55. A memo written by Lieutenant Dawne Clark (hereinafter "Lt. Clark") to whom the inmate reported the incident indicates that she was initially instructed to generate an incident report by Captain William Faneuff (hereinafter "Captain Faneuff") but after speaking with the inmate, she was instructed by Captain Faneuff to generate the memo. (Ex. F, Affidavit of William Faneuff, dated June 21, 2011 at ¶7, hereinafter "Faneuff Aff.").

56. Captain Faneuff recalls Lt. Clark reporting to him this inmate's complaint regarding Officer May and directing her to talk with the inmate after which she reported to him that the inmate did not want to file a formal complaint but wanted the incident noted in the event of future occurrences. Based on the nature of the inmate's complaint and the absence of other evidence to substantiate the credibility of the inmate, Captain Faneuff instructed Lt. Clark to generate the above-described memo to the Deputy Warden and copy him on it. (Ex. F, Faneuff Aff. at ¶8).

57. Captain Faneuff recalls that Lt. Clark did not disagree with his decision to generate the informal memo and not to file an incident report. (Ex. F, Faneuff Aff. at ¶9).

58. The incident of the inmate reporting that he had been called a "snitch" by Officer May differs from the incident of DeMaio calling an inmate a "snitch" based on the credibility of the witnesses and the nature of the inmate complaint. The incident involving DeMaio was corroborated by staff members from which an incident report was generated and a formal investigation conducted.  In contrast, an incident report was not generated nor a formal investigation conducted of the incident involving Officer May for the reason that the credibility of an inmate is not considered trustworthy compared to that of a staff member in the absence of other evidence. Furthermore, the inmate did not want to file a

formal complaint but wanted the incident noted in the event of future occurrences. (Ex. F, Faneuff Aff. at ¶11).

59. DeMaio testified that she does not know of any other male officers other than May about whom it has been reported that they called an inmate a "snitch" who were not disciplined. (Ex. A, DeMaio depo. at pp. 58:10-25, 59:1-3).

**<u>DISCIPLINES OF MALE STAFF FOR CALLING INMATES ABUSIVE NAMES</u>**

60. The following male employees, including Correction Officers, have been disciplined for calling inmates names in violation of A.D. 2.17.   (Ex. B, Callahan Aff. at ¶29).

- **Nelson Correia (Male)**
- **Lieutenant**
- **1-day suspension (reduced to written reprimand by stipulated agreement)**
- **Date of discipline: November 1, 2004**

Lieutenant Correia told an inmate in front of a nurse and other inmates that the inmate had been molested/raped as a child.  He also made comments about the inmate being in for murder but shooting the wrong person.

- **Wayne Davidson (Male)**
- **Correction Officer**
- **1-day suspension & administrative transfer**
- **Date of discipline: January 14, 2005**

Officer Davidson belittled and made fun of an inmate in front of other inmates by pointing out how small the inmate's chest was and how small the inmate's arms were.  He told the inmate his eight-year-old son could beat him because they were the same size and got into a boxing stance in front of the inmate.  Officer Davidson admitted to making the statements and video footage confirmed that Officer Davidson got into a fighting stance and made a motion toward the inmate.  The inmate named two staff witnesses who agreed there was yelling between Officer Davidson and the inmate.  The routing slip notes that discipline should be higher but the investigation took a while and, therefore, recommends lesser discipline (i.e. a one-day).

- **Juan Gonzalez (Male)**
- **Correction Officer**
- **5-day suspension**
- **Date of discipline: August 4, 2010**

A lieutenant overheard Officer Gonzalez leave the officer's bubble saying "fuck that fucking nigger."  She then observed Officer Gonzalez yell at an inmate through the food trap, saying "you punk motherfucker.  Punk-ass nigger.  I will beat your punk ass.  You better be glad you're in there.  I will fuck you up faggot."

- **Christopher Lindley (Male)**
- **Correction Officer**
- **1-day suspension**
- **Date of discipline: February 29, 2008**

An inmate yelled something vulgar about Officer Lindley's mother (saying "I'll fuck your mother and shit down her neck").  Officer Lindley called the inmate a "little piece of shit" and held his arms for 3–4 seconds before releasing him.  Officer Lindley reported the incident to his superiors, stating that he had an altercation with an inmate and that he had "fucked up" because he had put his hands on the inmate for insulting his mother.  In addition to admitting that he used inappropriate language with the inmate, Officer Lindley admitted that the inmate was not a physical threat when he laid his hands on him, thereby using excessive force.

- **Patrick Mainolfi (Male)**
- **Correction Officer**
- **1-day suspension**
- **Date of discipline: December 13, 2004**

An inmate claimed Officer Mainolfi called him a snitch and a rapist.  Officer Mainolfi admitted to a captain that he called the inmate a snitch but denied calling him a rapist.  During the subsequent investigation, Officer Mainolfi denied that he called the inmate a snitch and denied that he admitted calling the inmate a snitch to the captain.

- **Mikhael McArthur (Male)**
- **Correction Officer**
- **5-day suspension**
- **Date of discipline: January 31, 2002**

Officer McArthur flicked the housing unit lights and told the inmates to "get on your fucking bunks."  Inmate Hernandez asked (calmly) why Officer McArthur was disrespecting the inmates.  Officer McArthur yelled at him to "get on your fucking bunk" and told Inmate Hernandez that he would be "fucking your old lady tonight."  Later, both Officer McArthur and Inmate Hernandez were threatening each other with bodily harm.  The incident was reported by staff witnesses, including shift supervisors and staff, who stated that Officer McArthur acted in an unprofessional manner and threatened the inmate with bodily harm.

When the shift supervisors attempted to have Officer McArthur clarify his statement, he responded in a threatening and insubordinate manner.

- **Raymond Petucciano (Male)**
- **Correction Officer**
- **15-day suspension**
- **Date of discipline: December 5, 2006**

Officer Petucciano told an inmate "you didn't hang yourself yet, you should go hang yourself, I want a good hanging."  A staff member witnessed Officer Petucciano encouraging the inmate to kill himself.

- **Ferdinand Velez (Male)**
- **Lieutenant**
- **Written Reprimand**
- **Date of discipline: August 8, 2008**

An inmate needed to be transported to the Restrictive Housing Unit (RHU). During the transport of the inmate to RHU, Lieutenant Velez engaged in a verbal confrontation with the inmate during which he said "go ahead – I'll knock your fucking teeth in, how about that?"  Handheld video footage with audio which was reviewed by the shift Commander shows Lieutenant Velez telling his staff to drag the inmate and responding to the inmate's threat to "bite someone" with the above statement.

### SECURITY DIVISION INVESTIGATIONS OF DEMAIO FOR UNDUE FAMILIARITY

61. The Security Division routinely conducts investigations of serious issues, including undue familiarity, relating to the safety and security of the prison environment for which high levels of discipline can be imposed, up to and including termination.  Security Divisions investigations require the authorization of the  Commissioner which routinely occurs in instances when an employee is the subject of repeated reports of conduct involving possible violations of the A.D.s. (Ex. D, Weir Aff. at ¶8).

62. On March 22, 2005, Commissioner Theresa Lantz (hereinafter "Commissioner Lantz") authorized a Security Division investigation into alleged issues of undue familiarity involving DeMaio.  On April 6, 2005, the investigation conducted by Captain Maria

28

Angelapoulos concluded that there was insufficient evidence to clearly prove or disprove undue familiarity by DeMaio regarding a letter sent by inmate Curran, addressed to the facility CRCI to the attention of DeMaio; the contents of which insinuated that DeMaio was involved in a romantic relationship with the inmate.  The investigation was initiated following an incident report being filed on March 4, 2005, following receipt of the letter at the correctional facility. (Ex. D, Weir Aff. at ¶9).

63. On December 29, 2005, Commissioner Lantz authorized a Security Division investigation into alleged issues of undue familiarity involving DeMaio, State School Teacher Mary Kane (hereinafter "Kane") or School Counselor Victoria Beaumier (hereinafter "Beaumier").  On January 30, 2006, the report of the investigation conducted by Antonio Santiago concluded that there was insufficient evidence to prove that female staff members; DeMaio, Kane, and Beaumier were involved in a sexual or personal relationship with inmate Traynham. An incident report had been generated on November 5, 2005, following receipt of a phone call by the facility from a female claiming to be Traynham's wife stating that her husband, Traynham, had been involved in a sexual relationship with DeMaio. The investigation was expanded to also focus on Kane and Beaumier due to their "alarming amount of concern" for Traynham's well-being upon learning of his placement in restrictive housing because of the allegations involving DeMaio. In addition, a comparison of the writing of a romantic note in Traynham's black composition notebook with writing samples of DeMaio, Beaumier and Kane indicated similarities to Beaumier's and Kane's writing samples. (Ex. D, Weir Aff. at ¶10).

64. On November 14, 2007, Commissioner Lantz authorized a Security Division investigation into alleged issues of undue familiarity involving DeMaio. On February 29,

2008, the report of the investigation conducted by Captain Denise M. Walker concluded

that the allegation of undue familiarity of DeMaio with inmate Perez could not be

substantiated through factual evidence but that she had used poor judgment in allowing

inmate Perez to engage in conversations with her on the walkway between two buildings.

An incident report had been generated on November 8, 2007, following a facility based

investigation which included five (5) videotapes of five (5) different occasions in which

DeMaio was observed in conversations with Perez lasting six (6) to eleven (11) minutes.

In addition, Perez and his mother confirmed that he purchased a Red Sox shirt for

DeMaio for her birthday. (Ex. D, Weir Aff. at ¶11).

65. The above-described investigation concerning inmate Perez was initiated based on

information from a confidential source (SOI) that reported that inmate Perez was

involved with  DeMaio, that he meets with her daily at breakfast time, stands with

DeMaio in the yard for an extended period of time as well as at the bottom of the

walkway between two buildings and that the inmate would sometimes opt not to go to

breakfast and instead stay on the walkway and talk with DeMaio during the entire time

his dorm is at breakfast. (Ex. D, Weir Aff. at ¶12).

66. On December 13, 2007, DeMaio was interviewed regarding the above-described Security

Division investigation of the allegation of undue familiarity with inmate Perez. (Ex. D,

Weir Aff. at ¶15).

67. Although the allegation of undue familiarity with inmate Perez was not substantiated,

DeMaio's conduct was found to be in violation of A.D. 2.17, Employee Conduct and its

subsections of Employee Responsibility and Standards of Conduct, specifically Section 4

and Section 5A 1 and 2 for not acting in a responsible manner, failing to comply with

Department and Unit Directives and lawful instructions/orders, and failing to ensure a safe, secure and sanitary work environment in jeopardizing the security of the dormitory. These violations were based on her admission that she used the emergency exit door to the unit for a non-emergency.  She was also found to be in violation of the Standards of Conduct, Sections 5A 2 and 4, for failing to ensure a safe, secure and sanitary work environment and failing to remain alert, aware of, and responsive to the surroundings at all times by speaking to inmate Perez on the walkway on at least five (5) occasions in conversations lasting six (6) to eleven (11) minutes.  This behavior was also found to amount to behavior strictly prohibited by A.D. 2.17 in jeopardizing the security of the unit, health, safety, or welfare of the public, staff or inmates, and being inattentive on duty. (Ex. D, Weir Aff. at ¶13).

68. DeMaio received an informal counseling for the above-described violations of A.D. 2.17, Employee Conduct; specifically for her poor judgment when she allowed inmate Perez to engage in conversations with her and also jeopardizing the security of the unit when she used the emergency exit door to the unit for a non-emergency. (Ex. D, Weir Aff. at ¶14).

### SECURITY DIVISION INVESTIGATIONS OF OFFICER BOROWSKI FOR UNDUE FAMILIARITY

69. Security Division files indicate that Correction Officer Christopher Borowski (hereinafter "Officer Borowski") has been investigated numerous times  regarding allegations of undue familiarity with inmates; all of which were unsubstantiated except for the most recent which is pending.  These investigations include an investigation in June 2003 regarding an inmate's allegation that Officer Borowski was her son; an investigation in April 2005 regarding a third party's allegation that Officer Borowski was one of sixteen (16) staff members with whom an inmate was having sexual relations; an investigation in

June 2005 regarding an inmate's allegation that Officer Borowski had sexually assaulted her in 2002; an investigation in November 2008 regarding an inmate's allegations that another inmate told them that Officer Borowski was having sexual relations with a female inmate; an investigation in November 2009 regarding an inmate's allegation that Officer Borowski was having sexual relations with another inmate; an investigation in September 2010 regarding an inmate's allegation that Officer Borowski sexually assaulted her on several occasions. (Ex. D, Weir Aff. at ¶16).

### AFFIRMATIVE ACTION INVESTIGATIONS OF DEMAIO'S COMPLAINTS AA05-35

70. On February 22, 2005, DeMaio filed an affirmative action complaint alleging a hostile work environment due to the retaliatory actions of Lt. Adrian Reaves (hereinafter "Lt. Reaves"), claiming that the hostile behavior toward her began following her report on August 14, 2004, of his failure to handle properly a sexually-related offense of an inmate masturbating in front of her by putting an inmate in restrictive housing (RHU) pursuant to CRCI's practice and moved her workstation instead.  The complaint claimed retaliation by Lt. Reaves in assigning DeMaio to posts that she did not like and writing her up for insubordination for not letting him into the unit in a timely way and for her unprofessional response about the locked doors in the above-described December 22, 2004, incident.   In addition, the complaint alleged her being skipped for overtime on two occasions, March 31, 2005, and April 1, 2005, by Lt. Hunter, acting and being spoken to by Lt. Reaves for not responding at roll call and addressing another male officer for visiting her on a break. (Ex. D, Weir Aff. at ¶17).

71. During her interview for the investigation of the above-described affirmative action complaint, DeMaio stated that she did not know why she waited two months to report her

problems regarding Lt. Reaves; the incidents having occurred on 8/16/04 and 12/22/04 and her complaint not being filed until 2/22/05.  (Ex. D, Weir Aff. at ¶18).

72. The report of the Affirmative Action investigation found Officer DeMaio's complaint to less credible based on the untimeliness of her complaint; the complaint having been filed two months after the last incident and six months after the earlier incident involving Lt. Reaves. (Ex. D, Weir Aff. at ¶19).

73. The report of the Affirmative Action investigation of DeMaio's above-described complaint did not substantiate a hostile work environment as to Lt. Reaves's alleged retaliatory actions; finding that the CRCI did not violate A.D. 2.2, Sexual Harassment Section 8C, entitled "failure of a manager or supervisor to take action upon witnessing or receiving a report of sexual harassment or sexual misconduct committed by an inmate against an employee." The report found that when the administration discovered the inappropriate steps taken by Lt. Reaves in changing DeMaio's posts instead of placing the inmate in restrictive housing, the administration immediately remedied the situation by placing the inmate in restrictive housing, assuring DeMaio that Lt. Reaves' actions would be addressed with him and counseling Lt. Reaves.  Furthermore, the report found that Lt. Reaves was not culpable of not taking action but that he took action which exhibited poor judgment.  The report also concluded that Lt. Reaves did not violate A.D. 2.2 Section 6B-C & D, "selectively disciplining the employee…" and "holding the employee to a higher standard of performance than other co-workers." (Ex. D, Weir Aff. at ¶20).

74. The report of the Affirmative Action Investigation, AA05-35, found that Lt. Reaves was unaware of the facility's policy of automatically placing an inmate found masturbating in

restrictive housing, the facility to which he was previously assigned not following this policy for this particular infraction.  In addition, the facility also took immediate steps to correct the action as soon as the supervisors became aware of it by placing the inmate in restrictive housing on the next shift.  Furthermore, Lt. Reaves was informally counseled regarding his poor judgment in dealing with the incident. (Ex. D, Weir Aff. at ¶20).

75. The report of the Affirmative Action Investigation, AA05-35, also did not substantiate DeMaio's complaint of a hostile work environment as to Lt. Reaves addressing another officer for visiting her on a break for the reason that department policy prohibits staff visiting others during their break and a roll call memo had been issued by Captain Moore because of staff consistently violating the policy.  Captain Moore also verified that Lt. Reaves spoke to two officers about the infraction after the issuance of the roll call memo. (Ex. D, Weir Aff. at ¶21).

76. The report of the Affirmative Action investigation, AA05-35, also did not substantiate DeMaio's complaint of a hostile work environment as to Lt. Reaves treating her differently in writing her up or filing an incident report regarding her insubordinate response about unlocking and locking doors during an incident on December 22, 2004, DeMaio claimed that Lt. Reaves singled her out when he entered the officer's station and only asked her why she did not open the unit door for him when two other male officers were present and also did not open the door.  The report found credible Lt. Reave's claim that he made eye contact with DeMaio when he tried to enter the unit and did not see the other officers in the officer station so he believed that she was the only one there.  For that reason, he addressed only DeMaio at first but made a general statement asking why none of the officers opened the door when he saw them after knocking on the station

77. During the above-described investigation, Lt. Reaves stated that he intended to follow his usual practice of simply counseling an officer as to DeMaio's insubordinate responses to his questions as to not opening the unit door and keeping the double locked doors locked. He gave examples of two officers whom he counseled for their insubordinate behavior and did not write them up because he encountered the problem only one time with these officers. These examples were corroborated by the officers. Lt. Reaves further stated that he did not follow his usual practice of counseling as to DeMaio because he was instructed to file an incident report by his supervisor, Captain Moore, who stated that he gave this instruction to Lt. Reaves because DeMaio had been insubordinate in the presence of other officers. (Ex. D, Weir Aff. at ¶23).

78. DeMaio testified that she did not know if Lt. Reaves's conduct as to allegedly singling her out as to the December 22, 2004, incident in asking only her why she did not open the doors was based on her gender but "I took it as that. Or I took it as he just did not like me. But the way he addressed it and the way he went about it was totally unprofessional." (Ex. A, DeMaio depo. at pp. 42:23-25, 43:1-2).

79. In response to being further questioned as to whether Lt. Reaves's conduct was based on her gender or because he simply did not like her, DeMaio testified; "I took it as he was

just being unprofessional. And I took it as sexual harassment, absolutely." (Ex. A, DeMaio depo. at p. 43:3-7).

80. The report of the Affirmative Action investigation, AA05-35, also did not substantiate DeMaio's complaint of a hostile work environment as to her name having been purposefully skipped over on the overtime list for March 31, 2005 and April 1, 2005, by Lt. Hunter in concert with Lt. Reaves.  The investigation found that she was not skipped or called out of turn on the two days at issue based on a review of the OT call sheets for those days.  She was called on second shift on March 31, 2005, before her third shift comrades were called.  On April 1, 2005, she had the same number of hours as the officers that were called prior to her.  She had equal or higher hours than the officers called.  Overtime is governed by the NP-4 contract and is offered first to the employees with the lowest number of OT hours and last to employees with the highest number of OT hours.  (Ex. D, Weir Aff. at ¶24; Ex. A, DeMaio depo. at p. 83:22-25, 84:9-25; Ex. B, Callahan Aff. at ¶34).

81. The report of the Affirmative Action investigation, AA05-35, also did not substantiate DeMaio's complaint of a hostile work environment as to being counseled by Lt. Reaves on April 2, 2005, for not responding at roll call when he called out her name.  DeMaio claimed that she did not hear him at first but when he called her name a second time, she heard him and responded.   A witness corroborated her failure to respond and the lack of any reason for DeMaio not being able to hear Lt. Reaves.  The investigation further found that Captain Moore instructed Lt. Reaves to counsel DeMaio in the presence of other lieutenants after Lt. Reaves reported the incident to him. (Ex. D, Weir Aff. at ¶25).

82. The report of the Affirmative Action Investigation, AA05-35, also did not substantiate a hostile work environment as to DeMaio's complaint of unfavorable post assignments based on Lt. Reaves' lack of involvement in post assignments; that determination being made every 56 days by the shift commander, Captain Jerry Moore.  The report further noted Lt. Reaves and Captain Moore's lack of awareness of DeMaio's preference for a yard post rather than unit posts and Moore's report that DeMaio's last post assignment had been a yard post. (Ex. D, Weir Aff. at ¶26).

83. DeMaio testified at her deposition that she has absolutely no idea what posts Lt. Reaves assigned her to that she did not like because it occurred seven years ago but that assignments to undesirable posts are a daily and weekly occurrence for all correction officers by lieutenants in the event the lieutenants do not like the officers.  The same occurs with the skipping of overtime. (Ex. A, DeMaio depo. at pp. 78:9-25, 79:1-3).

84.  DeMaio testified at her deposition that Lt. Reaves's placement on posts that she did not like was limited to when she worked overtime on the second shift because he was the second shift lieutenant.  She testified that this occurred 5 to 10 times over a one year period. (Ex. A, DeMaio depo. at pp. 79:18-25, 80:1-3).

85. DeMaio testified that postings are totally at the discretion of the lieutenant and that an officer can request a certain post assignment before a shift but that she never made any such requests and does not know if other officers do so. (Ex. A, DeMaio depo. at pp. 80:21-25, 81:1-12).

86. DeMaio testified that the basis of Lt. Reaves' knowledge of her dislike for certain posts was his knowledge of her; "Because he knew me."  "Yes, he knew me well enough to know." (Ex. A, DeMaio depo. at pp. 81:13-17, 83:12-14).

87. DeMaio testified that the posts she did not like that Lt. Reaves placed her on included the medical dorms because the inmates are old guys who are "snitches" who "tell the Brass everything" … about correctional officers or other inmates. "Whatever move, I don't know, whatever you may possibly do or not do, or they just make things up. They're inmates." (Ex. A, DeMaio depo. at pp. 81:18-25, 82:1-21).

88. DeMaio testified that the other post she did not like that Lt. Reaves assigned her to was the dorms.  She also testified that she really did not mind the dorms but that some officers did not like the dorms because of the inmate contact in having to deal with them for eight (8) hours, including putting 120 inmates to bed at night. (Ex. A, DeMaio depo. at pp. 82:22-25, 83:1-5).

89. DeMaio testified that all the lieutenants, including Lt. Reaves, take into account officers' preferences for post assignments whether they admit to it or not. (Ex. A, DeMaio depo. at p. 83:15-21).

**<u>AFFIRMATIVE ACTION INVESTIGATION AA07-154</u>**

90. On December 17, 2007, DeMaio filed an incident report alleging harassment by the "administration" in Lt. Reaves advising her that she should not be talking to inmates for a prolonged period of time, DeMaio claiming that she spoke with the inmate for no more than 3-5 minutes. Lt. Reaves reported that DeMaio spoke with the inmate for approximately 15 minutes and that the conversation appeared not to be professional given that both parties were smiling and appeared relaxed as if conducting a casual conversation and that DeMaio paid no attention to her surroundings and the safety and security of the unit. (Ex. D, Weir Aff. at ¶27).

91. Lt. Reaves filed a incident report regarding the same above-described incident on December 17, 2007. (Ex. D, Weir Aff. at ¶28).

92. DeMaio's above-described incident report was immediately referred to Bob Jackson, Equal Employment Opportunity Director because of the claim of harassment.  Jackson found the claim not to be within the jurisdiction of Affirmative Action; specifically A.D. 2.1 or 2.2.  (Ex. D, Weir Aff. at ¶29).

93. The facility recommended further investigation by the Security Division on the basis that DeMaio, by her own admission, appeared to have engaged in unprofessional, prolonged conversation with an inmate of an unprofessional nature in violation of A.D. 2.17, Employee Conduct Section 5, Subsection B, 21 under prohibited conduct which states "Engage in conduct that constitutes or gives rise to, the appearance of a conflict of interest" and general post orders section 4, "Each employee of Carl Robinson Correctional Institution shall at all times, be alert and aware to his or her surroundings and responsibilities." (Ex. D, Weir Aff. at ¶30).

94. On January 2, 2008, Deputy Warden Christopher McDonald (hereinafter "Deputy Warden McDonald") held a Coaching Session with DeMaio regarding the above-described incident "stressing that that it is not acceptable to engage in casual conversation with inmates for an extended period of time." (Ex. D, Weir Aff. at ¶31).

**AFFIRMATIVE ACTION INVESTIGATION AA08-78**

95. On June 25, 2008, DeMaio filed an affirmative action complaint alleging harassment by Lt. Reaves after verbally informing Lt. Clark of her desire to file an affirmative action complaint; Lt. Clark then informing DeMaio's supervisor who prepared an incident report.  A copy of the incident report along with the affirmative action complaint and the

previous incident report filed on December 17, 2007, were forwarded to the Warden for his review on June 25, 2006, and to Affirmative Action on June 27, 2008.   Affirmative Action acknowledged receipt of DeMaio's complaint on June 30, 2008. (Ex. D, Weir Aff. at ¶32).

96.   The report of the affirmative action investigation, AA08-78, indicates that the affirmative action investigator made several attempts to contact DeMaio including speaking with her by phone on July 3, 2008, during which she was unwilling to provide any information. Although DeMaio agreed to call the investigator back on July 8, 2008 to set up an appointment so that she could speak in person, she did not call back.  The investigator then arranged through the Warden to schedule an appointment to meet at the facility on July 25, 2008 at 8:30 a.m., but DeMaio was unable to attend. The meeting finally took place on July 29, 2008 at the Affirmative Action Unit. (Ex. C, Weir Aff. at ¶33).

97.   At the above–described meeting on July 29, 2008, DeMaio stated that she felt harassed by Lt. Reaves because he seemed to be monitoring her interaction with inmates.  She discussed two incidents of alleged harassment by Lt. Reaves in monitoring her interaction with inmates; one three weeks previously in which Lt. Reaves told an inmate to stop talking to her and keep moving while she was answering his question and monitoring the chow line.  The other incident occurred in December 2007 regarding a conversation with an inmate in the dorms for which Lt. Reaves wrote an incident report.  DeMaio stated that she felt singled out by Lt. Reaves because of her history of being investigated for undue familiarity. (Ex. D, Weir Aff. at ¶34).

98.   The Affirmative Action Unit did not conduct an investigation because of the finding that DeMaio's complaint did not allege violations under A.D. 2.1 and/or A.D. 2.2 and

therefore did not present issues within its jurisdiction. (Ex. D, Weir Aff. at ¶35).

**AFFIRMATIVE ACTION INVESTIGATION AA08-85**

99. On July 5, 2008, during the investigation of the incident of calling inmate Brewer a "snitch," DeMaio told Lt. Clark that Lt. Jiminez had sexually assaulted her "sometime ago" while she was working on first shift by taking her into a side office, grabbing her ass and sticking his tongue down her mouth. She also stated that she told Captain Case who gave her a week to resolve the problem, but nothing happened and Captain Case never did any paperwork on the matter. She also alleged that officers had done inappropriate sexual acts in front of her like showing their private parts to her but did not provide the names of the other officers who performed sexually inappropriate acts. (Ex. D, Weir Aff. at ¶36).

100. Lt. Clark's incident report indicates that DeMaio stated that other female officers can talk to inmates for extended periods of time and no supervisor says anything to them, but when she is seen speaking with an inmate, she is told by supervisors that she is spending too much time with the inmate or her job is not to talk with inmates. (Ex. D, Weir Aff. at ¶37).

101. Lt. Clark's incident report further indicates that DeMaio stated that she feared for her safety being on the same compound as Lt. Jiminez after several inmates warned her that Lt. Jiminez is out to get her in asking two inmates to wear wires in the form of a writing pen to record DeMaio's personal conversations with them. The report further indicates that Lt. Jiminez is retaliating against her for not having accepted his sexual advances in 2003.  (Ex.D, Weir Aff. at ¶38).

102.  DeMaio stated during her interview that she did not recall telling Lt. Clark that she did not feel safe on the compound with Lt. Jiminez and doesn't know if she ever said that. (Ex. D, Weir Aff. at ¶39).

103.  Lt. Clark's incident report further states that DeMaio stated that she felt she is being punished for filing complaints, and ever since she filed a complaint she has been pulled from her assigned post, told not to talk to certain staff members and every move she makes is watched by someone. (Ex. D, Weir Aff. at ¶40).

104.  On July 17, 2008, Deputy Warden McDonald met with DeMaio at the direction of Warden Cuscovitch to inform DeMaio that her complaints of sexual harassment had been forwarded to Affirmative Action but that Affirmative Action could not investigate her allegations of sexual harassment against Lt. Jiminez without more specific information regarding the dates and times of the alleged harassment as well as information on her allegation of staff showing their private parts.  The report indicates that DeMaio agreed to provide an estimate of dates and times of sexual harassment by Lt. Jiminez but refused to provide the names of staff who allegedly exposed themselves to her.  (Ex. D, Weir Aff. at ¶¶41, 42).

105.  DeMaio provided a supplemental incident report regarding the 7/3/08 incident stating that she did not feel comfortable providing the requested information to anyone at this facility but that she understood that she could discuss the matter with Affirmative Action. Her Supplemental Incident Report was forwarded to Affirmative Action along with Deputy Warden McDonald's Supplemental Incident Report of his meeting with DeMaio and request for more information.  (Ex. D, Weir Aff. at ¶43).

106.   DeMaio's above-described complaint regarding sexual harassment by Lt. Jiminez was determined to be outside the specific timeframe guidelines as outlined in A.D. 2.2 regarding investigation complaints.  In making this determination, the Equal Opportunity Director indicated that if DeMaio had additional information, she could submit it directly to the Affirmative Action Unit for review.  (Ex. D, Weir Aff. at ¶¶44, 45).

**AFFIRMATIVE ACTION INVETSIGATION (AA09-81) OF DEMAIO'S CHRO COMPLAINT (CHRO NO. 0940268)**

107.   On February 20, 2009, DeMaio filed a complaint of harassment and retaliation with the CHRO, Case No. 0940268. (Ex. D, Weir Aff at ¶46).

108.   On May 1, 2009, the Affirmative Action Unit issued their report of the investigation of the above-described CHRO complaint, limiting the investigation to the claim of retaliation by Lt. Jiminez against DeMaio in Lt. Jiminez's attempt to persuade an inmate to wear a wire so that evidence could be gathered against her and allegedly she could be terminated.  The complaint alleged that Lt. Jiminez's conduct was in retaliation for her complaint of Lt. Jiminez having sexually assaulted her in 2003. The investigation noted that the remaining allegations had been previously addressed in the four complaints filed with the Affirmative Action Unit; specifically AA05-35, AA08-154, AA08-78, and AA08-85. (Ex. D, Weir Aff. at ¶47).

109.   The above-described investigation report of DeMaio's CHRO complaint found that DeMaio never followed up with the Affirmative Action Unit by submitting additional information directly to the Unit in response to the Director's advisement to do the same in his determination of the untimeliness of her complaint (AA08-85) in 2008 as to the sexual assault by Lt. Jiminez in 2003. (Ex D, Weir Aff. at ¶48).

110.  During the above-described investigation, Lt. Jiminez stated that he had no knowledge of DeMaio's claim of sexual assault until 2008 when she filed a previous complaint (AA08-85) and further denied the sexual assault that allegedly took place in 2003.  (Ex. D, Weir Aff. at ¶49).

111.  The above-described investigation report of DeMaio's CHRO complaint found that the facility had no record or report of the alleged attempted sexual assault by Lt. Jiminez. (Ex. D, Weir Aff. at ¶50).

112.  The above-described investigation report of DeMaio's CHRO complaint noted the difficulty in scheduling an interview with Officer DeMaio, noting the she was reluctant to speak to the investigator but after repeated phone calls and finally consented to an interview on April 13, 2009. (Ex. D, Weir Aff. at ¶51).

113.  The above-described investigation report of DeMaio's CHRO complaint found DeMaio's credibility to be questionable as to her allegation that nothing was done when she reported the alleged sexual assault by Lt. Jiminez to Captain Case in 2003.  The report found that DeMaio contradicted herself by stating that she told Captain Case that she did not want anything on paper and did not want anything done when she reported it to Captain Case.  The report further found her reasons of being a fairly new employee and not wanting any problems was questionable in that she was not a new employee as she described herself.  In addition, she had a perfect opportunity to file a sexual harassment complaint in 2003 given that the issue of sexual harassment was at its height at DOC in 2003, and a stipulated agreement had been put into effect resulting in revisions to A.D. 2.2 to strengthen DOC's affirmative action policy.  (Ex. D, Weir Aff. at ¶52).

114.   The above-described investigation report of DeMaio's CHRO complaint further found

DeMaio's credibility to be questionable based on Captain Case's statements that she

waited three months to report the assault to him during an investigation of her for undue

familiarity on October 16, 2003, rather than immediately.   The report also noted that

Captain Case stated that DeMaio told him that she had filed an Affirmative Action

complaint which the investigator determined not to be true.   The report also noted that

Captain Case stated that DeMaio described the incident to him as Lt. Jiminez stepping

into her private space close to her face, leaning in as if to attempt to kiss her.   The

investigator found Captain Case to be credible based on his voluntary response to the

investigator's questions given his three-year retirement status.   The investigator further

found Captain Case to be credible given DeMaio's failure to provide a copy of the

incident report of the sexual assault that she told the investigator that she had filed after

the interview on April 14, 2009, despite the investigator sending her a reminder letter on

April 14, 2009.   The investigator noted that DeMaio's claim as to filing an incident report

of the sexual assault contradicted her complaint and her interview where she stated that

she put nothing in writing.   The investigator further found Captain Case's statements to

be credible because DeMaio refused to provide a copy of the police report that she said

she had filed during her interview but that the investigator would have to talk with her

attorney.   After agreeing to meet in person with the investigator at her facility on April

23, 2009 at 3 p.m. when the investigator informed her of her obligation to cooperate in

the investigation as a DOC employee, DeMaio did not come to work that day.   The

investigator was told that DeMaio had gone out on Worker's Compensation the day

before and never heard anything from her thereafter nor received the police report. (Ex. D, Weir Aff. at ¶53).

115.   The above-described investigation report of DeMaio's CHRO complaint further found no evidence of retaliation on the part of Lt. Jiminez in asking the inmate to wear a wire to record DeMaio's conversations for the reason that Lt. Jiminez's responsibilities as a lieutenant included participation in the investigations of the SRG which involved the use of inmate informants.  In that capacity, Lt. Jiminez had no authority to make such a request but was directed by Deputy Warden McDonald in collaboration with Captain Faneuff to speak to the inmate about working with SRG in regard to its investigation of DeMaio based on her extensive history of suspected undue familiarity with inmates dating back to 2003 and which included several incidents in 2008.  In addition, final authority for wiring an inmate required the approval of the Security Division. (Ex. D, Weir Aff. at ¶54).

116.   The above-described investigation report of DeMaio's CHRO complaint further found a pattern or correlation between the dates of the filing of her complaints and the dates she was under investigation or subjected to discipline.  On February 17, 2005, DeMaio was loudermilled for unprofessional conduct.  On February 22, 2005, she filed a sexual harassment complaint against Lt. Reaves (AA05-35) which was investigated and not substantiated.  On December 13, 2007, she was interviewed by the Security Division with regard to suspected undue familiarity with an inmate.  On December 16, 2007, she filed a sexual harassment complaint with the Affirmative Action Unit against Lt. Reaves (AA08-154) which was determined not to be an Affirmative Action issue. Between June 2008 and November 2008, the facility was looking into undue familiarity issues regarding

DeMaio.  In that time period, she filed two complaints.  The first one, on June 30, 2008 alleged Lt. Reaves was harassing her because he was monitoring her interactions with inmates (AA08-78) which was determined not to be an affirmative action issue. The second one which was filed on July 8, 2008, alleged that Lt. Jiminez sexually assaulted her in 2003 (AA08-85) which was determined to be filed outside the specific timeframe guidelines and therefore untimely.  DeMaio was given the opportunity to provide additional information directly to the Affirmative Action Unit which she did not do. On December 3, 2008, the Security Division started an investigation of DeMaio based on information gathered between June 2008 and November of 2008.  DeMaio filed a CHRO complaint on February 20, 2009.   (Ex. D, Weir Aff. at ¶55).

117.   The above-described investigation report of DeMaio's CHRO complaint did not substantiate DeMaio's allegations of sexual harassment and retaliation.  The report concluded that DOC did not violate A.D. 2.2 Section 6A in that no retaliation occurred by Lt. Jiminez in asking the inmate to wear the wire based on information gathered during the investigation and a credibility assessment of the parties.  The report further concluded that DeMaio had not shown good cause for filing the complaint five years after the alleged sexual assault under A.D. 2.2 Section 9A and the alleged act was a finite incident. (Ex. D, Weir Aff. at ¶56).

**DEMAIO'S DEPOSITION TESTIMONY**

118.   DeMaio testified that she is treated differently because of her past history in being the subject of several investigations. "People look at me probably a little bit more, watch me a little bit more, and see what I'm doing, and they think, you know, I'm doing something I'm not supposed to be doing." (Ex. A,  DeMaio depo. at p. 87:7-12).

119.  DeMaio testified that she is treated differently based on her gender for the reason that male staff are not spoken to for speaking with inmates nor counseled.  "But if you have a male inmate, and the male staff member doing exactly what I'm doing, they don't think anything of it." (Ex. A, DeMaio depo. at pp. 87:5-7, 16-19).

120.  DeMaio testified that she was not able to give any examples of male officers who were investigated for undue familiarity and who just received a verbal counseling. (Ex. A, DeMaio depo. at pp. 87:20-25, 88:1-5).

121.  DeMaio claims retaliation in Lt. Reaves frequently disciplining her for minor occurrences, including the written reprimand for not opening the door to the bubble and the counseling for not talking to inmates. (Ex. A, DeMaio depo. at pp. 85:5-7, 86:1-19).

122.  DeMaio testified her sexual harassment claim includes that she is routinely subjected to sexually derogatory comments by male officers. (Ex. A, DeMaio depo. at pp. 64:8-21, 65:9-12).

123.  DeMaio testified that she has never complained about the above-described sexually derogatory comments by male officers because of concern for being "blackballed;" "You just don't do that." (Ex. A, DeMaio depo. at pp. 64:22-25, 65:1-8).

124.  DeMaio testified that female officers engage in sexually derogatory comments and that she may have engaged in conversations involving sexually derogatory comments, but it depends on the nature of the conversation as to whether she walks away or engages in the conversation; "but I don't know."  (Ex. A, DeMaio depo. at p. 65:13-23).

125.  DeMaio testified that her sexual harassment and hostile work environment claims include Captain Faneuff's statement during her Loudermill for the inmate Perez incident

48

that he would think nothing of another female like Officer Kehoe talking to an inmate for more than 10 minutes but because it was her, "it's an issue." (Ex. A, DeMaio depo. at p. 69:2-23).

126.  Fanueff recalls DeMaio asking him during a break in an investigation of her for undue familiarity with which he was assisting sometime between 2006 an 2008 why she was being investigated so frequently for undue familiarity.  He recalls stating that the issue of undue familiarity is considered very serious and, thereby, requires investigation when allegations are brought to the attention of the administration. He further recalls that she then stated to him that if another female office like Officer Kehoe simply talks with another inmate, nothing happens but when she is seen talking with an inmate, an investigation for undue familiarity ensues. He did not respond to DeMaio because he considered her statement simply to be her unfounded opinion. He recalls that Officer Kehoe is female. (Ex. E, Fanueff Aff. at ¶12).

127.  DeMaio testified that Major McDonald stated to her that the reason for the investigation for undue familiarity regarding inmate Traynham was because of her good looks; "If you're a good looking female, you're going to have these problems" or "you're going to have these investigations." (Ex. A, DeMaio depo. at pp. 71:18-25, 72:1-18).

128.  DeMaio testified that Lt. Jiminez's attempt in 2008 to get an inmate to wear a wiretap to record their conversations was in retaliation for her refusal of his sexual advance that happened years before. (Ex. A, DeMaio depo. at pp. 74:14-25, 75:1).

129.  DeMaio testified that during the course of the investigations for undue familiarity, she was receiving performance evaluations with ratings of fully successful or excellent. (Ex. A, DeMaio depo. at p. 60:11-15).

130.  DeMaio stated during the investigation of her CHRO complaint that she had no proof of the alleged sexual assault. (Ex. 20 to Ex. D , DeMaio's Interview Statement, dated April 13, 2009 at p. 4 of 8).

### DEMAIO'S TRANSFER EFFECTIVE NOVEMBER 21, 2008

131.  Correction officers routinely and voluntarily place themselves on transfer lists which are granted on the basis of seniority pursuant to Article 10 of the collective bargaining agreement, known as the NP-4 contract.  At the time that a transfer is granted, the correction officer has the opportunity to accept or decline the transfer. (Ex. B, Callahan Aff. at ¶30).

132.  DeMaio requested a transfer, dated December 5, 2007, to Manson Youth Institution which was not granted. (Ex. B, Callahan Aff. at ¶31).

133.  DeMaio requested a transfer, dated July 2008, to Enfield and Manson Youth Institution which was approved on August 14, 2008, effective November 21, 2008.  DeMaio accepted the transfer. (Ex. B, Callahan Aff. at ¶32).

DEFENDANT

STATE OF CONNECTICUT,
DEPARTMENT OF CORRECTION

GEORGE JEPSEN
ATTORNEY GENERAL


BY:    */s/ Eleanor May Mullen*
    Eleanor May Mullen
    Assistant Attorney General
    Fed. Bar No. ct22430
    55 Elm Street, P.O. Box 120
    Hartford, CT 06141-0120
    Tel.: (860) 808-5340
    Fax: (860) 808-5383
    Email: eleanor.mullen@ct.gov


## CERTIFICATION

I hereby certify that on this 30th day of June, 2011, a copy of the foregoing Defendant's Local 56(a)1 Statement of Material Facts was filed electronically.  Notice of this filing was sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.


*/s/ Eleanor May Mullen*
Eleanor May Mullen
Assistant Attorney General
Fed. Bar No. ct22430
55 Elm Street, P.O. Box 120
Hartford, CT 06141-0120
Tel.: (860) 808-5340
Fax: (860) 808-5383
E-mail:  eleanor.mullen@ct.gov